FILED IN CHAMBERS
U.S.D.C. Atlanta

MAY 2 2 2023

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# GUILTY PLEA and PLEA AGREEMENT

United States Attorney
Northern District of Georgia

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION
## CRIMINAL NO. 1:16-cr-237-RWS-JSA

The United States Attorney for the Northern District of Georgia ("the Government") and Defendant James G. Maloney, enter into this plea Agreement as set forth below in Part IV pursuant to Rules 11(c)(1)(A) & (B) of the Federal Rules of Criminal Procedure. James G. Maloney, having received a copy of the above-numbered Indictment and having been arraigned, hereby pleads GUILTY to Count 1.

## I.    ADMISSION OF GUILT

1.    The Defendant admits that he is pleading guilty because he is in fact guilty of the crimes charged in Count 1.

## II.    ACKNOWLEDGMENT & WAIVER OF RIGHTS

2.    The Defendant understands that by pleading guilty, he is giving up the right to plead not guilty and the right to be tried by a jury. At a trial, the Defendant would have the right to an attorney, and if the Defendant could not afford an attorney, the Court would appoint one to represent the Defendant at trial and at every stage of the proceedings. During the trial, the Defendant would be presumed innocent and the Government would have the burden of proving him guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the

witnesses against him. If the Defendant wished, he could testify on his own behalf and present evidence in his defense, and he could subpoena witnesses to testify on his behalf. If, however, the Defendant did not wish to testify, that fact could not be used against him, and the Government could not compel him to incriminate himself. If the Defendant were found guilty after a trial, he would have the right to appeal the conviction.

3.    The Defendant understands that by pleading guilty, he is giving up all of these rights and there will not be a trial of any kind.

4.    By pleading guilty, the Defendant also gives up his right to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could have been filed.

5.    The Defendant also understands that he ordinarily would have the right to appeal his sentence and, under some circumstances, to attack the conviction and sentence in post-conviction proceedings. By entering this Plea Agreement, the Defendant may be waiving some or all of those rights to appeal and to collaterally attack his conviction and sentence, as specified below.

6.    Finally, the Defendant understands that, to plead guilty, he may have to answer, under oath, questions posed to him by the Court concerning the rights that he is giving up and the facts of this case, and the Defendant's answers, if untruthful, may later be used against him in a prosecution for perjury or false statements.

III.   ACKNOWLEDGMENT OF PENALTIES

7.   The Defendant understands that, based on his plea of guilty, he will be subject to the following maximum and mandatory minimum penalties:

   a.   Maximum term of imprisonment: 20 years.

   b.   Mandatory minimum term of imprisonment: None.

   c.   Term of supervised release: 0 years to 3 years.

   d.   Maximum fine: $250,000, or twice the gain or twice the loss, whichever is greatest, due and payable immediately.

   e.   Full restitution, due and payable immediately, to all victims of the offense(s) and relevant conduct.

   f.   Mandatory special assessment: $100, due and payable immediately.

   g.   Forfeiture of any and all proceeds obtained, directly or indirectly, from the commission of the offense(s).

8.   The Defendant understands that, before imposing sentence in this case, the Court will be required to consider, among other factors, the provisions of the United States Sentencing Guidelines and that, under certain circumstances, the Court has the discretion to depart from those Guidelines. The Defendant further understands that the Court may impose a sentence up to and including the statutory maximum as set forth in the above paragraph and that no one can predict his exact sentence at this time.

9.    REMOVAL FROM THE UNITED STATES: The Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty. Indeed, because the Defendant is pleading guilty to this offense, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the District Court, can predict to a certainty the effect of his conviction on his immigration status. The Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

### IV.   PLEA AGREEMENT

10.   The Defendant, his counsel, and the Government, subject to approval by the Court, have agreed upon a negotiated plea in this case, the terms of which are as follows:

### No Additional Charges

11.   The United States Attorney for the Northern District of Georgia agrees not to bring further criminal charges against the Defendant related to the charges to which he is pleading guilty. The Defendant understands that this provision does not bar prosecution by any other federal, state, or local jurisdiction.

**Factual Basis**

12.     From in or about February 2007 through in or about November 2013, the
        Defendant knowingly and willfully conspired with James J. Acree and
        James D. Fraley, III to commit mail fraud and wire fraud.

13.     The Defendant and his coconspirators were employed by Georgia Tech
        and were members of the research faculty at the Georgia Tech Research
        Institute (GTRI), where they were assigned to the Advanced Concepts
        Laboratory. The Defendant and his coconspirators are experts in
        electromagnetic analysis and measurements and worked on projects
        funded by the United States Department of Defense, various intelligence
        agencies, and private industry.

*PCard Fraud*

14.     As part of his duties and responsibilities at GTRI, Fraley had access to a
        Georgia Tech PCard. Fraley was supposed to use his PCard to purchase
        materials and supplies for official Georgia Tech business purposes. Neither
        he nor anyone else was allowed to charge personal expenses on a PCard.
        Nevertheless, the Defendant and his coconspirators charged
        approximately $200,000 worth of personal expenses on Fraley's PCard,
        including two four-wheelers and a trailer, two Sony 52-inch flat-screen
        televisions, Apple computers, iPads, OtterBox protective cases, iPods,
        Kindle E-readers, Leica and Nikon digital cameras, video cameras, a mini
        micro pinhole video camcorder pen, a night vision monocular, two pairs of
        binoculars, Bose headphones, a 3D printer, sports watches with heart-rate
        monitors, sunglasses, materials used to perform private consulting

contracts, computer monitors and solar panels for a private hunting club, a personal video network for home use, and an uninterruptible power supply for a tennis ball machine.

15.   The Defendant and Fraley also used Fraley's PCard to pay for remodeling and maintenance expenses related to six rental properties that they owned together in the name of a Georgia corporation called J's Services, Inc. Some of those payments were charged to GTRI contracts that were funded by the United States.

16.   After the Defendant and his coconspirators learned that they were being investigated by Georgia Tech's Internal Auditing Department, they met to discuss their PCard fraud, get their stories straight, and plan a cover-up. Fraley recorded these conversations on his phone and later turned the recordings over to the FBI.

*Fraudulent Consulting Activity*

17.   In or about February 2007, the Defendant and Acree were reprimanded by GTRI for engaging in outside consulting activity that violated Georgia Tech's conflict-of-interest policy.

18.   In response, on or about February 22, 2007, the Defendant and Acree sent a letter to their supervisor at GTRI, acknowledging that they had used facilities and equipment owned by Georgia Tech for their own personal gain and benefit.

19.  The Defendant and Acree also made the following statements: "We deeply regret our failure to properly report this consulting activity in a timely fashion. . . . All parties understand that this is unacceptable . . . . No further consulting arrangements are in-play or under consideration. . . . This activity was initiated without the consent or prior knowledge of GTRI . . . , and we understand that this was contrary to policy. We truly regret any potential harm this may cause to the image of GTRI . . . and won't let this happen again in the future."

20.  Nevertheless, the Defendant and Acree continued to engage in outside consulting activity that harmed Georgia Tech, and they were soon joined by Fraley.

21.  Beginning in or about December 2007, and continuing through at least in or about March 2013, the Defendant and his coconspirators moonlighted as consultants for Picatinny Arsenal, SRA International, and the U.S. Air Force, while they were employed by Georgia Tech.

22.  The Defendant and his coconspirators were paid a combined total of approximately $500,000 for the consulting work they did for Picatinny Arsenal, SRA International, and the U.S. Air Force.

23.  The Defendant and his coconspirators obtained this outside consulting work from Picatinny Arsenal, SRA International, and the U.S. Air Force by falsely leading the customers to believe that the work would be done by GTRI. The Defendant and his coconspirators furthered this false impression by using their official GTRI telephone numbers and GTRI

email addresses in their communications with the customers. In addition, the Defendant and his coconspirators met with the customers at GTRI's headquarters on the Georgia Tech campus and gave the customers tours of GTRI's labs and other facilities. At no time did the Defendant or his coconspirators reveal to the customers that GTRI was not involved in, or even aware of, the work they were doing.

24. The Defendant and his coconspirators used Acree's former employer, Tec-Masters, as a billing pass-through on these consulting jobs. Tec-Masters is a defense contractor located in Huntsville, Alabama. Tec-Masters performed no labor on any of these consulting jobs but facilitated the transfer of money from the customers to the Defendant and his coconspirators.

25. From December 2010 through July 2013, while they were employed full-time by Georgia Tech, the Defendant and Fraley moonlighted as consultants for Spectra Research, Inc.

26. The Defendant and Fraley were paid a combined total of approximately $196,000 for the consulting work they did for Spectra.

27. The Defendant and Fraley caused and directed Georgia Tech employees who were under their supervision at GTRI to help perform this consulting work for Spectra.

28. The Defendant and Fraley also caused and directed those Georgia Tech employees to bill time for Spectra work to the United States on contract

D6308, even though the Defendant and Fraley knew that the Spectra work was not related to D6308.

29.    In competing for, performing, and billing for the outside consulting work described above, the Defendant and his coconspirators violated Georgia Tech's conflict-of-interest policy and code of business conduct; diverted customers and revenue away from Georgia Tech for their own personal gain and benefit; used Georgia Tech facilities and equipment for their own personal gain and benefit; used and caused others to use interstate wire communications, including email and electronic funds transfers; and caused checks and documents to be delivered by U.S. mail and by FedEx.

**Admissibility of Plea Agreement/Factual Basis and Waiver of Rights**

30.    The Defendant agrees that if he fails to comply with any of the provisions of this Plea Agreement, including by failing to tender such Agreement to the Court, or attempts to withdraw the plea (before or after pleading guilty to the charge identified in this Agreement), the Government will have the right to characterize such conduct as a breach of this Agreement.

31.    In the event of such a breach, the Defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and the Government will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding, this Agreement and any of the information, statements, and materials provided by him

pursuant to this Agreement, including offering into evidence or otherwise using the Factual Basis set forth in paragraphs 12-29 of this Agreement.

## Dismissal of Counts

32. The Government agrees that, upon the entry of the Judgment and Commitment Order, any and all remaining counts in the above-styled case still pending against the Defendant shall be dismissed pursuant to Standing Order No. 07-04 of this Court and to Rule 48(a) of the Federal Rules of Criminal Procedure. The Defendant understands that the Probation Office and the Court may still consider the conduct underlying such dismissed counts in determining relevant conduct under the Sentencing Guidelines and a reasonable sentence under Title 18, United States Code, Section 3553(a).

## Sentencing Guidelines Recommendations

33. The Government and the Defendant hereby stipulate and agree that:

   a. The applicable offense guideline is § 2B1.1(a)(1), which establishes a Base Offense Level of 7.

   b. The amount of loss resulting from the offense of conviction and all relevant conduct is more than $1,500,000 but less than $3,500,000, which results in a 16-level upward adjustment under § 2B1.1(b)(1)(I).

   c. The offense involved sophisticated means, and the Defendant intentionally engaged in or caused the conduct constituting

sophisticated means, which results in a 2-level upward adjustment under Section 2B1.1(b)(10)(C).

d.    The Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation of the instant offense of conviction, and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct, or a closely related offense, which results in a 2-level upward adjustment under § 3C1.1.

e.    The Defendant was an organizer, leader, manager, or supervisor of the criminal activity, which did not involve five or more participants and was not otherwise extensive, which results in a 2-level upward adjustment under § 3B1.1(c).

**Acceptance of Responsibility**

34.    The Government will recommend that the Defendant receive the 2-level adjustment for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines. However, the Government will not be required to recommend acceptance of responsibility if, after entering this Plea Agreement, the Defendant engages in conduct inconsistent with accepting responsibility. Thus, by way of example only, should the Defendant falsely deny or falsely attempt to minimize the Defendant's involvement in relevant offense conduct, give conflicting statements about the Defendant's involvement, fail to pay the special assessment, fail to meet any of the obligations set forth in the Financial Cooperation Provisions set forth

below, or participate in additional criminal conduct, including unlawful

personal use of a controlled substance, the Government will not be

required to recommend acceptance of responsibility.

**Right to Answer Questions, Correct Misstatements,
and Make Recommendations**

35.     The parties reserve the right to inform the Court and the Probation Office

        of all facts and circumstances regarding the Defendant and this case, and

        to respond to any questions from the Court and the Probation Office and

        to any misstatements of fact or law. Except as expressly stated elsewhere in

        this Plea Agreement, the parties also reserve the right to make

        recommendations regarding application of the Sentencing Guidelines. The

        parties understand, acknowledge, and agree that there are no Agreements

        between the parties with respect to any Sentencing Guidelines issues other

        than those specifically listed.

**Right to Modify Recommendations**

36.     With regard to the Government's recommendation as to any specific

        application of the Sentencing Guidelines as set forth elsewhere in this Plea

        Agreement, the Defendant understands and agrees that, should the

        Government obtain or receive additional evidence concerning the facts

        underlying any such recommendation, the Government will bring that

        evidence to the attention of the Court and the Probation Office. In

        addition, if the additional evidence is sufficient to support a finding of a

        different application of the Guidelines, the Government will not be bound

Page **12** of **29**

to make the recommendation set forth elsewhere in this Plea Agreement, and the failure to do so will not constitute a violation of this Plea Agreement.

**Sentencing Recommendations**

**Specific Sentence Recommendation**

37.     Unless the Defendant engages in conduct inconsistent with accepting responsibility, as described more fully in paragraph 34, the Government agrees to recommend that the Defendant be sentenced within the adjusted guideline range. The Defendant may argue for a sentence below the adjusted guideline range.

**Restitution**

38.     The Defendant agrees to pay full restitution to the Clerk of Court for distribution to all victims of the offense to which he is pleading guilty and all relevant conduct, including, but not limited to, any counts dismissed as a result of this Plea Agreement. The Defendant understands that the amount of restitution owed to each victim will be determined at or before sentencing, but he agrees that the total amount of such restitution is at least $1,500,000. The Defendant also agrees to cooperate fully in the investigation of the amount of restitution, the identification of victims, and the recovery of restitution for victims.

39.     The Defendant understands that the full restitution amount is due and payable immediately. If the Defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the

Probation Office at any time, he agrees that the custodial agency and the Probation Office will have the authority to establish a restitution payment schedule—which would represent his minimum obligation—and that the Government would be entitled to pursue other sources of recovery. The Defendant agrees to cooperate with the Government's efforts to collect the restitution by any legal means the Government deems appropriate. The Defendant and his counsel agree that the Government may contact the Defendant regarding the collection of restitution without notifying counsel and outside the presence of counsel.

**Forfeiture**

40. The Defendant acknowledges that each asset listed below was purchased and maintained with proceeds of the mail and wire fraud conspiracy, the illegal activity to which the Defendant is pleading guilty, and that each asset listed below is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The Defendant agrees that he shall immediately forfeit to the United States any proceeds from the commission of the offense alleged in the Indictment, including, but not limited to, the following:

    a.    Real Property known as 126 Artie Lane, Rossville, GA 30741, Parcel Tax Identification Number 0125-051, together with all appurtenances thereto, improvements thereon, furnishings and fixtures;

b.      Real Property known as 2271 Johnson Road, Chickamauga, GA
        30707, Parcel Tax Identification Number 0-163-017A, together with
        all appurtenances thereto, improvements thereon, furnishings and
        fixtures;

c.      Real Property known as 640 Mission Ridge Road, Rossville, GA
        30741, together with all appurtenances thereto, improvements
        thereon, furnishings and fixtures;

d.      Real Property located in Walker County, Georgia, together with all
        appurtenances thereto, improvements thereon, furnishings and
        fixtures, more particularly described as follows: All that tract or
        parcel of land lying and being in Original Land Lot Nos. 136 and
        137, in the 9th District and 4th Section of Walker County, Georgia,
        being known and designated as Lot No. 7, WARREN TERRACE
        SUBDIVISION, as shown on plat of said subdivision of record in
        Plat Book 5, Page 75, in the Office of the Clerk of the Superior Court
        of Walker County, Georgia. Being the same property described in
        Deed Book 1735, Page 480, in the Office of the Clerk of the Superior
        Court of Walker County, Georgia;

e.      Real Property located in Walker County, Georgia, together with all
        appurtenances thereto, improvements thereon, furnishings and
        fixtures, more particularly described as follows:
        TRACT I:  ALL THAT TRACT OR PARCEL of land lying and being
        in Original Land Lot No. 246, in the 9th District and 4th Section of

Walker County, Georgia, and being more particularly described as follows: BEGINNING at a point on the Old Road, which beginning point is 100 feet measured along the Old Road from the Northeast corner of the Mamie Buckland Tract; thence with and along the Old Road in a Northeasterly direction a distance of 100 feet; thence in a Southerly direction a distance of 105 feet to a point; thence in a Westerly direction a distance of 100 feet to the Southeast corner of other property deeded to Romaince Ellison and wife, Carrie Dozier Ellison, and Tony Higgin, as described in Deed Book 319, Page 46, in the Office of the Clerk of the Superior Court of Walker County, Georgia; thence with and along the East line of the aforementioned Ellison and Higgin property, in a Northerly direction, a distance of 105 feet to the POINT OF BEGINNING. And being a lot of land 100 feet wide by 105 feet deep fronting on the Old Road.

TRACT II:  ALL THAT TRACT OR PARCEL of land lying and being in Original Land Lot No. 246, in the 9th District and 4th Section of Walker County, Georgia, and being more particularly described as follows: BEGINNING at a point on the Old Road, which beginning point is the Northeast corner of the Mamie Buckland tract; thence continuing with and along the Old Road as it meanders in a Northeasterly direction a distance of 100 feet to a point; thence in a Southerly direction and running parallel with the East line of the Buckland tract a distance of 105 feet to a point; thence in a Westerly

direction a distance of 100 feet to the East line of the Buckland tract; thence with and along the West line of the Buckland tract in a Northerly direction a distance of 105 feet to the POINT OF BEGINNING. And being a lot of land 100 feet wide by 105 feet deep fronting on the Old Road.

Tracts I and II being further described as 0.48 acres in a Survey for David Clark prepared by Max Randal Compton (GRLS No. 2584) dated November 5, 2009 (Job No 9—140) and, according to said survey, being more particularly described as follows: BEGINNING at a point of the Southeastern right of way line of Lail Sawmill Road at a point which is a distance of 179.2 feet Northeast of the intersection of the Southeastern right of way line of Lail Sawmill Road and the Northern right of way line of GA Hwy. No. 341; thence along and with the Southeastern right of way line of Lail Sawmill Road, North 31 degrees 02 minutes 33 seconds East, a distance of 200 feet to a one inch pipe; thence leaving said right of way line, South 63 degrees 13 minutes 52 seconds East, a distance of 105 feet to a point; thence South 31 degrees 02 minutes 33 seconds West, a distance of 200 feet to a point; thence North 63 degrees 13 minutes 52 seconds West, a distance of 105 feet to a point on the Southeastern right of way line of Lail Sawmill Road, the POINT OF BEGINNING. A copy of said survey is attached as Exhibit "A" to that certain Quitclaim Deed Recorded in Deed Book recorded in

Deed Book 1644, Page 414, in the Office of the Clerk of the Superior Court of Walker County, Georgia and is hereby incorporated herein by specific reference thereto. BEING the same real estate described in Deed Book 1644, Page 414, in the Office of the Clerk of Superior Court of Walker county, Georgia, Parcel Tax Identification Number 0-146 058;

f.   Real Property located in Chattanooga, Tennessee, together with all appurtenances thereto, improvements thereon, furnishings and fixtures, more particularly described as follows: LOCATED IN THE CITY OF CHATTANOOGA, HAMILTON COUNTY, TENNESSEE BEING the South one-half of Lot 28, BLOCK 16, D.F. SHAUF'S ADDITION, fronting 48 feet, more or less, on the West line of St. Elmo Avenue, and running between parallel lines, a distance of 175 feet to the East line of the Shauf Place. BEING the same real estate described Deed Book 3884, Page 579, in the Register's Office of Hamilton County, Tennessee, Parcel Tax Identification Number 167"O"-B-015.

41.   The Defendant waives and abandons all right, title, and interest in all of the property listed above (referred to hereafter, collectively, as the Subject Property) and agrees to the administrative or judicial forfeiture of the Subject Property. In addition, the Defendant waives and abandons his interest in any other property that may have been seized in connection

with this case. The Defendant agrees to the administrative or judicial forfeiture or the abandonment of any seized property.

42.   The Defendant states that J's Services, Inc. (a Georgia corporation) is the titleholder of the Subject Property, that he and James D. Fraley, III each own 50% of J's Services, Inc., that to the best of his knowledge no other person or entity has any interest in the Subject Property, and that he has not transferred, conveyed, or encumbered his interest in the Subject Property. The Defendant, individually and as an officer of J's Services, Inc., agrees to take all steps requested by the United States to facilitate transfer of title of the Subject Property, including providing and endorsing title certificates, or causing others to do the same where third parties hold nominal title on the Defendant's behalf, to a person designated by the United States. The Defendant agrees to take all steps necessary to ensure that the Subject Property is not hidden, sold, wasted, destroyed, or otherwise made unavailable for forfeiture. The Defendant agrees, both in his personal capacity and as an owner and officer of J's Services, Inc., not to file any claim, answer, third party petition, or petition for remission or restitution in any administrative or judicial proceeding, including ancillary proceedings, pertaining to the Subject Property, and if such a document has already been filed, the Defendant hereby withdraws that filing.

43.   The Defendant agrees to hold the United States and its agents and employees harmless from any claims made in connection with the seizure, forfeiture, or disposal of property connected to this case. The Defendant

acknowledges that the United States will dispose of any seized property, and that such disposal may include, but is not limited to, the sale, release, or destruction of any seized property, including the Subject Property. The Defendant agrees to waive any and all constitutional, statutory, and equitable challenges in any manner (including direct appeal, a Section 2255 petition, habeas corpus, Rule 41, or any other means) to the seizure, forfeiture, and disposal of any property seized in this case, including the Subject Property, on any grounds.

44.   The Defendant acknowledges that he is not entitled to use forfeited assets, including the Subject Property, to satisfy any fine, restitution, cost of imprisonment, tax obligations, or any other penalty the Court may impose upon him in addition to forfeiture. However, the United States Attorney's Office for the Northern District of Georgia will recommend to the Chief of the Asset Forfeiture and Money Laundering Section (AFMLS) of the United States Department of Justice that property forfeited in this case be used to compensate the victim(s) specified in the restitution order, provided that the Government determines that the requirements for restoration as set forth in AFMLS Forfeiture Policy Directive 02-1, Paragraph III.A., are met. The Defendant understands that the decision on any petition for remission or restoration is not within the ultimate control of the United States Attorney's Office.

45.     The Defendant consents to the Court's entry of a preliminary order of forfeiture against the Subject Property, which will be final as to him, a part of his sentence, and incorporated into the judgment against him.

<u>Financial Cooperation Provisions</u>

**Special Assessment**

46.     The Defendant agrees that he will pay a special assessment in the amount of $100 by money order or certified check made payable to the Clerk of Court, U.S. District Court, 2211 U.S. Courthouse, 75 Ted Turner Drive SW, Atlanta, Georgia 30303, by the day of sentencing. The Defendant agrees to provide proof of such payment to the undersigned Assistant United States Attorneys upon payment thereof.

**Fine/Restitution - Terms of Payment**

47.     The Defendant agrees to pay any fine and/or restitution, plus applicable interest, imposed by the Court to the Clerk of Court for eventual disbursement to the appropriate account and/or victim(s). The Defendant also agrees that the full fine and/or restitution amount shall be considered due and payable immediately. If the Defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, he agrees that the custodial agency and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The Defendant understands that this payment schedule represents a minimum obligation and that, should the Defendant's financial situation establish that he is able to pay

more toward the fine and/or restitution, the Government is entitled to pursue other sources of recovery of the fine and/or restitution. The Defendant further agrees to cooperate fully in efforts to collect the fine and/or restitution obligation by any legal means the Government deems appropriate. Finally, the Defendant and his counsel agree that the Government may contact the Defendant regarding the collection of any fine and/or restitution without notifying and outside the presence of his counsel.

**Financial Disclosure**

48.    The Defendant agrees that the Defendant will not sell, hide, waste, encumber, destroy, or otherwise devalue any such asset worth more than $500 before sentencing, without the prior approval of the Government. The Defendant understands and agrees that the Defendant's failure to comply with this provision of the Plea Agreement should result in the Defendant receiving no credit for acceptance of responsibility.

49.    The Defendant agrees to cooperate fully in the investigation of the amount of forfeiture, restitution, and fine; the identification of funds and assets in which he has any legal or equitable interest to be applied toward forfeiture, restitution, and/or fine; and the prompt payment of restitution or a fine.

50.    The Defendant's cooperation obligations include: (A) fully and truthfully completing the Department of Justice's Financial Statement of Debtor form, and any addenda to said form deemed necessary by the

Government, within ten days of the change of plea hearing; (B) submitting to a financial deposition or interview (should the Government deem it necessary) prior to sentencing regarding the subject matter of said form; (C) providing any documentation within his possession or control requested by the Government regarding his financial condition and that of his household; (D) fully and truthfully answering all questions regarding his past and present financial condition and that of his household in such interview(s); and (E) providing a waiver of his privacy protections to permit the Government to access his credit report and tax information held by the Internal Revenue Service.

51.   So long as the Defendant is completely truthful, the Government agrees that anything related by the Defendant during his financial interview or deposition or in the financial forms described above cannot and will not be used against him in the Government's criminal prosecution. However, the Government may use the Defendant's statements to identify and to execute upon assets to be applied to the fine and/or restitution in this case. Further, the Government is completely free to pursue any and all investigative leads derived in any way from the interview(s)/deposition(s)/financial forms, which could result in the acquisition of evidence admissible against the Defendant in subsequent proceedings. If the Defendant subsequently takes a position in any legal proceeding that is inconsistent with the interview(s)/deposition(s)/financial forms–whether in pleadings, oral

argument, witness testimony, documentary evidence, questioning of witnesses, or any other manner–the Government may use the Defendant's interview(s)/deposition(s)/financial forms, and all evidence obtained directly or indirectly therefrom, in any responsive pleading and argument and for cross-examination, impeachment, or rebuttal evidence. Further, the Government may also use the Defendant's interview(s)/deposition(s)/financial forms to respond to arguments made or issues raised sua sponte by the Magistrate or District Court.

### Recommendations/Stipulations Non-binding

52.    The Defendant understands and agrees that the recommendations of the Government incorporated within this Plea Agreement, as well as any stipulations of fact or guideline computations incorporated within this Plea Agreement or otherwise discussed between the parties, are not binding on the Court and that the Court's failure to accept one or more of the recommendations, stipulations, and/or guideline computations will not constitute grounds to withdraw his guilty plea or to claim a breach of this Plea Agreement.

### Limited Waiver of Appeal

53.    LIMITED WAIVER OF APPEAL: To the maximum extent permitted by federal law, the Defendant voluntarily and expressly waives the right to appeal his conviction and sentence and the right to collaterally attack his conviction and sentence in any post-conviction proceeding (including, but not limited to, motions filed pursuant to 28 U.S.C. § 2255) on any ground,

except that the Defendant may file a direct appeal of an upward departure or upward variance above the sentencing guideline range as calculated by the District Court. Claims that the Defendant's counsel rendered constitutionally ineffective assistance are excepted from this waiver. The Defendant understands that this Plea Agreement does not limit the Government's right to appeal, but if the Government initiates a direct appeal of the sentence imposed, the Defendant may file a cross-appeal of that same sentence.

### Miscellaneous Waivers

**FOIA/Privacy Act Waiver**

54.    The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act of 1974, Title 5, United States Code, Section 552a.

## No Other Agreements

55.   There are no other Agreements, promises, representations, or

understandings between the Defendant and the Government.

In Open Court this ___22ND___ day of May, 2023.

SIGNATURE (Defendant's Attorney)
Craig A. Gillen
Anthony C. Lake

SIGNATURE (Defendant)
James G. Maloney

SIGNATURE (Assistant U.S. Attorney)
John Russell Phillips

SIGNATURE (Assistant U.S. Attorney)
Stephen H. McClain

Yonette Sam

SIGNATURE (Approving Official)
Yonette Sam

I have read the Indictment against me and have discussed it with my attorney. I understand the charges and the elements of each charge that the Government would have to prove to convict me at a trial. I have read the foregoing Plea Agreement and have carefully reviewed every part of it with my attorney. I understand the terms and conditions contained in the Plea Agreement, and I voluntarily agree to them. I also have discussed with my attorney the rights I may have to appeal or challenge my conviction and sentence, and I understand that the appeal waiver contained in the Plea Agreement will prevent me, with the narrow exceptions stated, from appealing my conviction and sentence or challenging my conviction and sentence in any post-conviction proceeding. No one has threatened or forced me to plead guilty, and no promises or inducements have been made to me other than those discussed in the Plea Agreement. The discussions between my attorney and the Government toward reaching a negotiated plea in this case took place with my permission. I am fully satisfied with the representation provided to me by my attorney in this case.

x _____     5/19/2023
SIGNATURE (Defendant)                DATE
James G. Maloney

I am James G. Maloney's lawyer. I have carefully reviewed the charges and the Plea Agreement with my client. To my knowledge, my client is making an informed and voluntary decision to plead guilty and to enter into the Plea Agreement.

_____     _____5/19/23_____
SIGNATURE (Defendant's Attorney)     DATE
Craig A. Gillen
Georgia Bar No. 294838
Anthony C. Lake
Georgia Bar No. 431149


GILLEN WITHERS & LAKE, LLC
400 Galleria Parkway
Suite 1920
Atlanta, Georgia 30339


Filed in Open Court

This 22nd day of May , 2023

By _Harey R. Kemp_

U. S. DEPARTMENT OF JUSTICE
Statement of Special Assessment Account

This statement reflects your special assessment only. There may be other penalties imposed at sentencing.

| ACCOUNT INFORMATION | |
|---|---|
| CRIMINAL ACTION NO.: | 1:16-cr-237-RWS-JSA |
| DEFENDANT'S NAME: | James G. Maloney |
| PAY THIS AMOUNT: | $100 |

Instructions:

1. Payment must be made by **certified check** or **money order** payable to:
   Clerk of Court, U.S. District Court
   **\*personal checks will not be accepted\***
2. Payment must be made to the clerk's office by the day of sentencing.
3. Payment should be sent or hand delivered to:
   Clerk, U.S. District Court
   2211 U.S. Courthouse
   75 Ted Turner Drive SW
   Atlanta, Georgia 30303
   (Do Not Send Cash)
4. Include the Defendant's name on **certified check** or **money order.**
5. Enclose this coupon to insure proper and prompt application of payment.
6. Provide proof of payment to the above-signed AUSA within 30 days of the guilty plea.